## SECURITIES AND EXCHANGE COMMISSION

v.

## John P. McGOFF, Global Communications Corp., Sacramento Publishing Co., Appellants.

### No. 79–2484.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1980.

Decided Feb. 3, 1981.

Certiorari Denied June 22, 1981. See 101 S.Ct. 3114.

Raymond G. Larroca, Washington, D. C., with whom Herbert J. Miller, Jr. and James E. Rocap, III, Washington, D. C., were on brief, for appellants.

Paul Gonson, Sol., SEC, Washington, D. C., with whom Jacob H. Stillman, Associate Gen. Counsel and Rosalind C. Cohen, Asst. Gen. Counsel, SEC, Washington, D. C., were on brief, for appellee.

Before EDWARDS and GINSBURG, Circuit Judges, and JOYCE HENS GREEN *,

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

U. S. District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

During the summer of 1979 the Securities and Exchange Commission instituted a formal, non-public investigation centering on John P. McGoff, a controversial newspaper publisher, columnist, and lecturer. Subpoenas duces tecum were served on McGoff and two companies wholly owned by him. The purpose of the investigation was to determine whether McGoff or corporations he served as helmsman violated anti-fraud, reporting, beneficial ownership, and proxy provisions of the Federal securities laws. Securities Exchange Act §§ 10(b), 13(a), 13(d), and 14(a), 15 U.S.C. §§ 78j(b), 78m(a), 78m(d), 78n(a) (1976 & Supp. III 1979). When McGoff and his companies refused to comply with the subpoenas the SEC initiated this enforcement proceeding.

In response to McGoff's objection that the subpoenas were unduly burdensome in that they sought records of fourteen separate entities, the SEC narrowed its demand to exclude references to "any affiliates, parents or subsidiaries" of companies named in the subpoenas. In response to McGoff's concerns that the information sought could include documentation regarding editorial decisions or the sources for or writing of news stories, District Judge Gerhard A. Gesell excluded from the reach of the subpoenas "any document which solely relates to editorial policy or solely relates to information obtained as part of the process of gathering news for possible publication." Joint Appendix (J.A.) at 220.

The SEC demands were made pursuant to marketplace regulatory laws of general applicability. Beyond question, those laws serve a substantial public interest. They are not aimed at the press as distinguished from other commercial ventures. They do not directly regulate the content, time, place, or manner of expression, nor do they

directly regulate political associations. We conclude that, in the order requiring compliance with the SEC's subpoenas, the district court appropriately accommodated McGoff's interests as a publisher. We further conclude that, on the facts before us, McGoff and his wholly owned companies were not entitled to launch an inquiry, through discovery, into the SEC's motives for instituting this investigation. We therefore affirm.

## I. *Background*

John McGoff is an "[a]ctive and vocal conservative" and has been a "[f]ierce critic of [Carter] administration" attitudes and policies. Brief for Appellants at 7. In particular, he has criticized insistently United States policy regarding South Africa. While McGoff believes that South Africa's racial policies are a "tragic mistake," he opposes attempts to limit United States investment in that country.

McGoff is the self-made helmsman of an extensive newspaper publishing and printing network. He is the founder, president, and sole owner of Global Communications Corp. (formerly named Star Newspaper Co.), one of the companies that resists enforcement of an SEC subpoena in this case. Global, in turn, wholly owns Sacramento Publishing Co., the second company challenging an SEC subpoena before this court. Sacramento and Global are apparently predominantly holding companies.

Of pivotal concern to the SEC, McGoff is the founder, president, a director, and a shareholder of Panax Corp., a publicly registered corporation whose common stock is traded over the counter. Panax owned and operated sixty-five daily and weekly newspapers in seven states at the time the SEC began its investigation in 1979. As of December 31, 1978, Global owned approximately 23% of Panax's outstanding common stock, Sacramento owned about 17% of the stock, and McGoff held directly about 1%. McGoff, therefore, had a beneficial interest in about 40% of Panax's stock.

Under section 13(d) of the Securities Exchange Act, 15 U.S.C. § 78m(d) (1976 & Supp. III 1979), beneficial owners of more than 5% of the shares of a publicly held corporation must disclose, *inter alia*, the number of shares owned, the source of funds used to purchase the shares, and any arrangements or understandings relating to the shares. McGoff, Global, and Sacramento have filed several § 13(d) statements relating to their Panax holdings. In the spring of 1979, however, the SEC became suspicious that they had not disclosed all of the required information.

One source of the SEC's suspicion was the *Erasmus Commission Report*, a report completed in December 1978 by a judicial commission that the government of South Africa appointed to inquire into alleged irregularities in that nation's former Department of Information. The *Erasmus Report* stated that McGoff had received more than $11.3 million from the South African government to attempt to purchase the *Washington Star* (one of the two major dailies published in the District of Columbia) and a controlling interest in the United Press International and Television Network (a London-based television news service). According to the *Erasmus Report*, the government of South Africa agreed to finance these purchases because it wanted McGoff to secure an influential media position from which he could stimulate favorable attitudes towards South Africa.

McGoff purchased an interest in the London news service for about $1.3 million. However, his negotiations for the purchase of the *Washington Star* were unsuccessful. Instead, again according to the *Erasmus Report*, McGoff used $6 million of the funds supplied by South Africa to purchase a newspaper in the capital of California, the *Sacramento Union*. The remaining $4 million, McGoff told South African officials, were used to operate the *Union*.

The SEC, however, entertained a different theory about McGoff's disposition of the South African funds. Shortly after McGoff received $10 million from South Africa for the anticipated purchase of the *Washington Star*, McGoff, Global (then Star Newspaper), and Sacramento began to acquire

large quantities of Panax stock.[1] The SEC suspected that South African government money was used for the "massive acquisitions" of Panax stock and that McGoff, Global, and Sacramento had failed to identify this source of funds in their § 13(d) statements. The SEC further suspected that McGoff might have made an undisclosed agreement with South African officials to use Panax newspapers to promote South African interests.

The *Erasmus Report* also aroused SEC suspicions about another possible violation of disclosure requirements. The report revealed that South Africa had asked McGoff to return the $11.3 million advanced to him. In 1978, after McGoff had agreed to repay at least some of the money, he obtained $1 million in cash from Panax in exchange for eleven Texas newspapers (the "Suburbia" newspapers) then owned by McGoff, Global, and Sacramento. The SEC suspected that appropriate disclosures respecting this transaction might not have been made and that the transaction might have been unfairly structured to benefit McGoff.

The SEC commenced a private investigation and served the subpoenas duces tecum that prompted this litigation. The subpoenas requested McGoff, Global, and Sacramento to produce "any and all documents concerning or involving . . . directly or indirectly" the following categories of information:

(1) any transactions, contacts, or dealings with the South African government or its political subdivisions; South African officials, political candidates, or political parties; and seven named South African political figures,

(2) any receipts or disbursements of South African funds,

(3) any transactions or proposed transactions involving the securities of Panax, Global, Sacramento, Star Newspaper Co. (the predecessor of Global), or the Suburbia newspapers,

(4) any transactions with the Union Bank of Switzerland or Thesaurus Continental Securities Corp. (the Swiss entities that allegedly funneled the South African funds to McGoff),

(5) the incorporation and capitalization of Global and its predecessor Star,

(6) any contacts or dealings concerning the proposed acquisition of the *Washington Star*, and

(7) any contacts or dealings concerning the acquisition or disposition of the *Sacramento Union* or Suburbia newspapers.

In addition, the SEC demanded the financial records of Global, Star, and Sacramento. The time frame for all requests ran from January 1, 1971, to the date of the demand.[2]

McGoff, Global, and Sacramento refused to comply with the SEC subpoenas, asserting that they were overbroad and offensive to First Amendment interests. The SEC thereupon initiated this enforcement proceeding. Shortly after institution of the proceeding, McGoff, Global, and Sacramento sought to determine, through interrogatories and a document production request, whether the SEC investigation was part of a coordinated government effort to harass McGoff. The SEC moved for a protective order prohibiting discovery.

After a hearing Judge Gesell entered orders disallowing discovery and directing McGoff, Global, and Sacramento to comply with the subpoenas. Judge Gesell modified the SEC's demands, however, by permitting McGoff and his companies to withhold documentation relating solely to "editorial poli-

---

1. Although McGoff had founded Panax, the report he filed with the SEC at the end of November 1973 indicated that he then owned, directly or indirectly, only 43,126 shares. J.A. 176. Five years later, his report showed ownership of nearly 460,000 Panax shares. J.A. 174. No report McGoff or his companies filed with the SEC mentions South African funds or any other ties to the government of South Africa.

2. The *Erasmus Report* describes relations between McGoff and South African officials commencing in 1968 and a relationship between McGoff and the former Minister of Information dating back to 1971. J.A. 152–53, 155.

cy" or "information obtained as part of the process of gathering news for possible publication."

McGoff, Global, and Sacramento appealed. On February 11, 1980, this court denied an application to stay the district court's order. A month later Chief Justice Burger, following reference of the matter to the entire Court, also refused to grant a stay.[3] On March 18, 1980, appellants began delivering documents to the SEC. We were advised at oral argument that document production has been "substantially completed."[4]

On appeal McGoff, Global, and Sacramento challenge both the enforcement of the SEC's subpoenas and the denial of their discovery requests. We address each of these claims in turn.

II. *Enforcement of the SEC Subpoenas*

■ McGoff and his companies, Global and Sacramento, have voluntarily associated themselves with Panax, a publicly held corporation, and are unquestionably subject to disclosure obligations the Federal securities laws impose on persons holding significant interests in such a corporation. They enjoy no special privilege as "press entities" to withhold information others must furnish to the investing public.

■ The SEC, invoking regulatory laws of general applicability, seeks to pursue a vigorous investigation involving McGoff's publishing and printing network. McGoff resists the investigation on the basis of his status as a publisher. We do not doubt his claims that the demands confronting him may affect his ability to gather and circulate information and argument or that they inquire into his associations with South African officials. But the Federal securities laws that the SEC invokes are nondiscriminatory, they impose no direct regulation on the content, time, place, or manner of expression, nor do they directly regulate

McGoff's associations. *See generally* Cox, *Foreword: Freedom of Expression in the Burger Court*, 94 Harv.L.Rev. 1, 50–55 (1980).

■ The Supreme Court has consistently rejected claims that the press is shielded by the Constitution against laws of general applicability of the kind involved here. *See Associated Press v. NLRB*, 301 U.S. 103, 130–33, 57 S.Ct. 650, 654, 81 L.Ed. 953 (1937) (application of National Labor Relations Act to employment of reporters and editors); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (application of Sherman Act to news gathering and disseminating organization); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 192–94, 66 S.Ct. 494, 497–498, 90 L.Ed. 614 (1946) (requiring newspapers to comply with minimum wage and overtime restrictions applicable to other enterprises producing goods for interstate commerce). More recently, the Court has ordered journalists to comply with legal obligations of general applicability in the face of assertions no less appealing than the ones made by McGoff. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 244 (1972) (reporters asked relevant questions in a grand jury probe are not privileged to conceal their sources and information conveyed to them under promise of confidentiality); *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (no special exemption for the media from the general rules of pretrial discovery); *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (no special immunity for the press from search warrants).

We do not understand McGoff, Global, and Sacramento to challenge their legal obligation to comply with SEC disclosure rules. Indeed, they have regularly filed § 13(d) statements without objection. Rather, they assert that the SEC has

---

**3.** Both this court and the Supreme Court had previously granted temporary stays to enable the courts to study the matter before acting.

**4.** Delivery of the documents does not moot this appeal. It is clear in this circuit that even after

subpoenaed documents have been fully disclosed, the subpoenaed party may pursue a claim for relief, including return of the documents. *FTC v. Browning*, 435 F.2d 96, 97–98 n.1 (D.C.Cir.1970).

reached too far, that it should have limited its inquiries to contacts with South Africa relating specifically to Panax stock acquisitions. Reply Brief for Appellants at 4–5.

The SEC, on the other hand, points out that the *Erasmus Report* describes a covert operation; it indicates but does not spell out financing and other agreements with McGoff. J.A. 203–04. To determine what the public has a right to know regarding Panax's financial and control arrangements, the SEC claims it must uncoil the skein of dealings in which McGoff was involved during the periods in which he may have negotiated the fund transfer with South African officials, when he so substantially augmented his Panax holdings, and when he transferred the Suburbia newspapers to Panax for $1 million in cash.

We have no doubt that the information the SEC demands in this case bears a sufficient relationship to possible violations of disclosure rules to fit comfortably within the general standard for enforcement of administrative subpoenas. *See FTC v. Carter,* 636 F.2d 781 at 788 (D.C.Cir.1980); *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1028–31 (D.C.Cir.1978) (information may be obtained if reasonably relevant to an inquiry within the authority of the agency), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). There are suggestions in recent opinions, however, that while press figures enjoy no special privilege exempting them from laws of general applicability, some balancing or special sensitivity is required in view of the vital function the press serves in a self-governing society. *See Branzburg v. Hayes, supra,* 408 U.S. at 709–10, 92 S.Ct. at 2670–2671 (Powell, J., concurring); *Zurcher v. Stanford Daily, supra,* 436 U.S. at 564, 98 S.Ct. at 1980 (where First Amendment interests are at stake, Fourth Amendment requirements should be applied with "scrupulous exactitude").

■ The district court believed, and we agree, that an accommodation was required to avoid unnecessary encroachment upon McGoff's activities and associations as a newspaper publisher and writer. Judge Gesell therefore authorized McGoff to retain documentation relating solely to "editorial policy" or news gathering. Under controlling precedent, *see Branzburg v. Hayes, supra,* McGoff was not entitled to more.

■ McGoff characterizes the exception for news gathering and editorial material as "meaningless." Brief for Appellants at 1. Because the word "solely" is employed in the exception,[5] McGoff contends that memoranda "relating to editorial policy in part and to financial expectations in part, apparently would be disclosable in their entirety." Brief for Appellants at 40 n.14. We believe that the order, read together with Judge Gesell's statement from the bench,[6] could be understood to permit the withholding of any segregable portion of a document falling within the excepted category. Moreover, we note that McGoff, who was to make the judgment in the first instance whether an item fell within the exception, might have sought clarification from the district court if he genuinely believed the order did "nothing to protect"[7] his editorial or news gathering activity.

■ Nor can we credit McGoff's arguments[8] that the subpoenas, in light of their impact on his publishing activity and political associations with prominent South Africans, should be rejected as more drastic than necessary, and as lacking an adequate foundation. In *Branzburg v. Hayes, supra,* 408 U.S. at 701–06, 92 S.Ct. at 2666–2669, the Supreme Court turned aside similar claims by reporters who sought to shield their sources and information given to them in confidence from a grand jury probe. *Accord, In re Possible Violations of 18 U.S.C. 371, 641, 1503,* 564 F.2d 567, 570–71 (D.C. Cir.1977).

---

5. *See* p. 2 *supra.*

6. J.A. 218 ("[Y]ou are not required to disclose *documentation* which exclusively concerns the writing of a news story or the source of a news story.") (emphasis supplied).

7. Brief for Appellants at 40 n.14.

8. Brief for Appellants at 36–37.

McGoff does not argue, nor do we find, that *Branzburg* is inapplicable here because an agency rather than a grand jury issued the subpoenas. Moreover, in an important respect, McGoff's case is less compelling than that of the reporters in *Branzburg*. McGoff is not in any sense a disinterested third party called upon to supply evidence.[9] He is the principal actor in the matters the SEC seeks to investigate[10] and the corporate parties subpoenaed are wholly owned by him.[11]

Accepting McGoff's position that his publishing and political association concerns should attract sensitive review, however, we believe that the SEC has indicated more than a "reasonably relevant" link between the information it seeks and an authorized inquiry. It has shown "a substantial relationship" between the information sought and an important government interest.

The SEC pursues here no minor infraction of a technical rule. United States ties to South Africa are the subject of widespread public debate, as McGoff well understands. Investors and potential investors in Panax have a clear stake in knowing, and a congressionally mandated right to disclosure, if South African funds have been used to finance sizable Panax share acquisitions. Similarly, they have a right to know the facts if McGoff has pledged to use Panax newspapers to promote South African interests. Further, if McGoff unfairly structured Panax's purchase of the Suburbia newspapers, current or future stockholders of Panax may be the losers. It seems to us plain, therefore, that the SEC investigation serves an important government interest in assuring full disclosure to the investing public. The SEC suspicions, aroused by the *Erasmus* inquiry in South Africa, may not be borne out by the Commission's probe, but it is well within the agency's mission to investigate the matter.

Substantial links tie the government interest asserted to the information sought by the SEC. McGoff, Global, Sacramento, and Panax are closely intertwined. Tracing the covered path of South African funds may well require scrutiny of the financial records of Global and Sacramento and of Global's predecessor, Star. Documents concerning transactions with the foreign entities that channeled South African government funds to McGoff, Union Bank of Switzerland and Thesaurus Continental Securities Corp., bear an obvious relationship to the tracing the SEC wishes to undertake. Documents describing McGoff's contacts with South Africa and its officials may reveal whether McGoff agreed to use Panax newspapers to promote South African interests. Such an agreement, if it existed, is more likely to be implicit in a long course of dealings than explicit in a single precise writing. Documents concerning the attempted acquisition of the *Washington Star* and the substituted purchase of the *Sacramento Union* may shed light on the controversy indicated in the *Erasmus Report* over the reciprocal undertakings of McGoff and South African officials; they bear a clear relationship to the SEC's purpose both to trace the disposition of South African funds and to determine whether agreements with South Africa bear on operation of any Panax newspapers. Inquiry into the acquisition and disposition of the Suburbia newspapers, finally, is plainly tied to determining whether the transaction, in which McGoff may have had a personal interest, was unfair to other Panax shareholders.

■ McGoff and his companies emphasize the breadth of the SEC subpoenas. We agree that the demands are broad.[12] But

---

**9.** *See also Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963) (heightened review is appropriate where a government institution pursues persons and organizations not themselves suspected of complicity in any unlawful conduct).

**10.** Judge Gesell's order safeguards to McGoff "any claim he may have under the Fifth Amendment." J.A. 220.

**11.** The SEC's subpoena power does not extend across the seas to foreign individuals and entities named in relationship to McGoff in the *Erasmus Report*.

**12.** *Cf. Branzburg v. Hayes, supra*, 408 U.S. at 673, 92 S.Ct. at 2652 (upholding grand jury

the nature of the inquiry precludes a trim list of requests. It bears emphasis that the SEC's non-public investigation involves no abusive governmental agency bent on " 'expos[ing] for the sake of exposure,' " " 'prob[ing] at will and without relation to existing need,' " or "forcing wholesale disclosure of names and organizational affiliations" for a purpose not germane to the agency's mission. *Branzburg, supra,* 408 U.S. at 700, 92 S.Ct. at 2666 (citing with approval and distinguishing *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957); *DeGregory v. Attorney General of New Hampshire,* 383 U.S. 825, 829, 86 S.Ct. 1148, 1151, 16 L.Ed.2d 292 (1966); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960)). Nor is this SEC inquiry a broad-scale legislative or executive foray into political activity and associations implicating direct sanctions against the exercise of First Amendment liberties. *Cf. Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

In sum, we conclude that Judge Gesell's order enforcing the SEC's subpoenas as modified appropriately weighed the competing interests in light of controlling Supreme Court precedent and merits our full approbation.

### III. *The Discovery Request*

█ McGoff and his wholly owned companies, Global and Sacramento, assert the possibility that the SEC's investigation "is politically motivated against a vocal critic of the [Carter] Administration." Brief for Appellants at 3, 42. To test "the *bona fides*"[13] of the investigation, McGoff and his companies served on the SEC a comprehensive set of interrogatories and a related request for documentary production. Judge Gesell disallowed any discovery. We

conclude that Judge Gesell appropriately applied the general rule excluding discovery in summary subpoena enforcement proceedings absent "extraordinary circumstances." *See United States v. Exxon Corp.,* 628 F.2d 70, 77 n.7 (D.C.Cir.), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980).

McGoff asserts that "extraordinary circumstances" exist in this case, as they did in *United States v. Fensterwald,* 553 F.2d 231 (D.C.Cir.1977). We find scant resemblance between the two cases. Bernard W. Fensterwald, Jr., the subject of a special Internal Revenue Service audit, was permitted by this court to engage in "limited discovery" to determine how the IRS selected his name for the audit. Fensterwald had represented Watergate defendant James McCord at the time McCord made the "revelations to District Judge Sirica which contributed so greatly to . . . public knowledge of the Watergate conspiracy." 553 F.2d at 232. In addition, Fensterwald had served as chief counsel of a Senate committee that undertook investigation of alleged illegal activities of the Internal Revenue Service. That investigation resulted in "revelations . . . damaging to the reputation of the IRS." *Ibid.* Moreover, the IRS maintained that names for the special audit had been selected "entirely by chance as a result of computer selection." Establishing that fact, the court said, "should be easy for the IRS." 553 F.2d at 233.

McGoff, however stern his criticism of Carter administration policies, can point to nothing concrete paralleling the McCord Watergate revelations, disclosures which occasioned "great embarrassment" to persons highly placed in the Executive Branch. Nor has he alleged, as Fensterwald did, that his prior involvement with the agency conducting the investigation might have stimulated that agency to retaliate against him. Finally, the SEC here does not defend its investigation, as the IRS did in *Fensterwald,* as a chance selection. Rather, the

summons directing reporter "to give such evidence as he knows relating to any matters which may be inquired of on behalf of the Commonwealth").

**13.** Brief for Appellants at 3, 42.

194

SEC moored the probe in significant part to information revealed in an official, published report of the Republic of South Africa.

Most Americans criticize their government at one time or another and many in a position to be heard do so regularly and harshly. If strong criticism of administration policy on the part of the target of an agency investigation were sufficient to authorize inquiry into the agency's motives, little would remain of the general rule that "[e]xcept in extraordinary circumstances ... discovery is improper in a summary subpoena enforcement proceeding." *United States v. Exxon Corp., supra,* 628 F.2d at 77 n.7. We hold that McGoff's diffuse speculations concerning possible misuse of administrative authority do not establish the "exceptional circumstances" necessary to take this case out of the general rule.

*Conclusion*

For all of the foregoing reasons, the orders of the district court are affirmed.