PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

AMERICAN TARGET ADVERTISING,

No. 00-1384

INCORPORATED; VIGUERIE AND
ASSOCIATES, INCORPORATED; THE
VIGUERIE COMPANY,
Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(MISC-99-56-MC)

Argued: December 4, 2000

Decided: July 11, 2001

Before WILKINS and KING, Circuit Judges, and
William L. GARWOOD, Senior Circuit Judge of the
United States Court of Appeals for the Fifth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Wilkins and Senior Judge Garwood joined.

_____

COUNSEL

**ARGUED:** Mark J. Fitzgibbons, Manassas, Virginia, for Appellants.
Colette Gianna Matzzie, Appellate Staff, Civil Division, UNITED

STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** William J. Olson, John S. Miles, WILLIAM J. OLSON, P.C., McLean, Virginia, for Appellants. David W. Ogden, Acting Assistant Attorney General, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

KING, Circuit Judge:

On January 9, 1998, under the authority of the Inspector General Act of 1978, the United States Postal Inspection Service issued subpoenas for certain records and documents in the possession of American Target Advertising, Inc., and Viguerie and Associates, Inc., direct-mail companies with a common base of operations in Manassas, Virginia. Shortly thereafter, on February 2, 1998, a third subpoena was served on yet another entity, The Viguerie Company, which is also engaged in the direct-mail business and operates from the same premises. The three companies (hereinafter referred to collectively as "American Target") are united by the common ownership of Richard A. Viguerie, self-described as "a well-known, politically-conservative businessman and political spokesman." Br. of Appellants, at 5. On their face, the subpoenas were issued for the purpose of investigating "[a] possible fraud against the Postal Service."

After American Target declined to produce the requested materials, the Government petitioned the district court for summary enforcement of the subpoenas. Following a hearing, the court granted the Government's petition and directed American Target to comply with the subpoenas within thirty days of the August 16, 1999 Order memorializing its decision. American Target moved to alter or amend the ruling, but that motion was ultimately denied by the district court by its Order of February 14, 2000. American Target timely filed a notice of appeal from both dispositive Orders, and it moved the district court to stay those Orders pending appeal. The court below denied the stay motion on April 14, 2000, prompting American Target to seek similar relief before us. See Fed. R. App. P. 8(a)(2). On April

2

19, 2000, a panel of this Court denied a stay, and American Target complied with the subpoenas.**1**

Having now had the benefit of briefing and oral argument, we proceed to consider the merits of this appeal. The question before us is whether the district court, constrained by its limited scope of review in such matters, clearly erred in summarily enforcing the subpoenas without -- at the very least -- permitting American Target discovery into what it contends is a politically motivated abuse of the administrative process. We conclude that the court committed no clear error, inasmuch as (1) the reasons proffered by the Postal Inspection Service for issuing the subpoenas withstand the appropriately narrow level of judicial scrutiny; and (2) American Target has not made a sufficient showing of abuse to vindicate its non-compliance with the subpoenas, or even to justify discovery of the catalyst behind the investigation. Hence, as outlined below, we affirm the Orders on appeal.

I.

We have previously recognized that, in most cases,"a district court's role in enforcing administrative subpoenas is sharply limited." EEOC v. Lockheed Martin Corp., Aero & Naval Systems, 116 F.3d 110, 113 (4th Cir. 1997) (citation and internal quotation marks omitted). The court below, in granting the Government's petition for enforcement, need only have discerned that (1) the Postal Inspection Service was authorized to undertake such an investigation; (2) the applicable statutory requirements of due process had been met; and (3) the materials requested were relevant. See id. (citing, inter alia, Oklahoma Press Publ'g Co. v. Walling, 327 U.S. 186, 216-17 (1946)). American Target attacks the district court's ruling as it pertains to the first of these three requirements, that of authorization. The lower court's decision in this regard is reviewed for clear error. Id.

_____

**1** American Target's production of the requested materials does not moot this appeal. See Church of Scientology of Cal. v. United States, 506 U.S. 9, 13 (1992) (where tapes and documents produced in response to IRS summons, appeal challenging propriety of summons permitted to proceed because "a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession").

3

(citing Reich v. National Eng'g & Contracting Co., 13 F.3d 93, 98 (4th Cir. 1993)).

II.

A.

At the outset, American Target contests the Postal Inspection Service's authority to issue subpoenas at all, suggesting that the agency's subpoena power instead resides exclusively in the Inspector General. From 1988, at least until the office of Inspector General was established within the Postal Service in 1996, see 39 U.S.C. § 202(e), the Postal Inspection Service was "responsible for exercising the authority, and carrying out the duties, functions, and responsibilities assigned to the Office of the Inspector General by the Inspector General Act." 39 C.F.R. § 224.3(c). And, to be sure, the referenced Act empowers the various Inspectors General "to require by subpena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned . . .[.]" 5 U.S.C. app. 3 § 6(a)(4). Although it seems clear that, in the absence of an Inspector General, the subpoena authority reposed therein by statute was legitimately exercised by the Postal Inspection Service, American Target maintains that such authority was necessarily divested once Congress created the office.

Whatever the merits of this argument, we decline to address them, as American Target failed to preserve the point by presenting it to the district court for consideration in the first instance. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998). Karpel states our settled rule that "issues raised for the first time on appeal generally will not be considered" except in the narrowest of circumstances, where, for example, plain error or a fundamental miscarriage of justice would otherwise result. Id. (citing, inter alia, Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 318 (4th Cir. 1988)). The present case is not the exceptional one contemplated by Karpel and Hanson.[2]

_____
[2] We note without comment that, on January 7, 1997, the newly appointed Inspector General, together with the Chief Postal Inspector of

4

B.

1.

American Target nonetheless asserts that, even if the general sub-poena authority of the Postal Inspection Service is assumed, no such authority existed in this specific instance. The Government, not sur-prisingly, maintains to the contrary. A proper examination of the mat-ter initially requires that we set forth the pertinent facts.

The purpose of the subpoenas, according to the Government's peti-tion, was "to obtain books and records of the target companies in order to determine whether they violated the `Cooperative Mailing' eligibility requirements for use of the Nonprofit Standard Rate." J.A. 11. Organizations and groups eligible for the Nonprofit Standard Rate are permitted to mail letters and other materials for about forty-three percent less than the rate paid by businesses operated for profit.

Problems can arise, however, when a nonprofit organization enters into "cooperative mailing agreements" with outside entities to conduct mailings at the reduced rate. See United States Postal Serv. v. Univ. Publ'g Co., 835 F. Supp. 489, 491 (S.D. Ind. 1993) (accepting as rea-sonable the Postal Service's definition of cooperative mailing as "a mailing in which one or more parties cooperate with an authorized nonprofit mailer to share the cost, risk, and benefits of the mailing"). The Postal Service takes the position that such arrangements involv-ing commercial enterprises are illegal because they"permit the for-profit party to bear financial risk and exert excessive financial and administrative control for direct mailing programs undertaken by the non-profit party." J.A. 29 (Declaration of Postal Inspector Mark P. Hines).

_____

the Postal Inspection Service, executed an "Interim Memorandum of Understanding" to permit the orderly transition of functions between their respective offices. This document memorialized the officers' agree-ment that, inter alia, the Postal Inspection Service would continue to exercise subpoena authority during the "interim period." The Memoran-dum failed to mention a specific date on which the interim period would terminate, but it was apparently ongoing more than one year afterward, when the subpoenas in this case were issued.

5

The Domestic Mail Manual ("DMM"), a Postal Service publication incorporated into the agency's regulations, see 39 C.F.R. §§ 111.1, 211.2(a)(2), provides that

> Cooperative mailings may be made at the special bulk rates only when each of the cooperating organizations is individually authorized to mail at the special bulk rates at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the special bulk rates at the post office where the mailing is deposited must be paid at the applicable regular rates. . . .

DMM § 625.521. This "Cooperative Mail Rule" embodied within the postal regulations effectively "restricts Nonprofit Standard Mail mailings to the authorized organizations' own mail." United States Postal Service Publication 417, Nonprofit Standard Mail Eligibility (1996), at 19 [hereinafter Publication 417].**3**

The records and documents sought by the subpoenas presumably disclose the nature of American Target's business relationships with a trio of nonprofit groups: The 60/Plus Association; United Seniors Association, Inc.; and Taxpayers Education Lobby/Seniors. Each of these organizations purports to function as a political advocate on behalf of senior citizens, and all have retained American Target to assist them in soliciting funds through the mails from their putative

_____

**3** Among other things, Publication 417 provides guidelines for evaluating whether a particular arrangement constitutes a cooperative mailing. Chapter 5 lists the relevant factors to be considered: (1) the identity of the party that "devised, designed, and paid for the mail piece"; (2) the party that "paid the postage on the mailing, either directly or indirectly"; (3) the manner in which "the profits and revenues[are] divided from the mailing or an enterprise it supports"; (4) the"risks [that] are entailed with the mailing . . . and who bears those risks"; (5) the party that "makes managerial decisions about the content of the mailing"; and (6) the nature of the "participants' intentions and interests." Publication 417, at 19. A nonprofit entity eligible for the reduced rate may enlist the assistance of a commercial mailing agent "if the organization can show that the relationship is a legitimate principal-agent relationship." Id.

6

constituency. If the current investigation were to reveal that these campaigns were so dominated by American Target as to preclude the solicitation letters from being the nonprofit groups' "own mail," the Postal Service could assess a postage deficiency for the difference between the discounted nonprofit rate and the regular rate. See 39 U.S.C. § 3626(k)(2).**4**

American Target contends, however, that cost, benefit, risk, and control are inappropriate factors to consider in deciding whether a particular solicitation effort constitutes a cooperative mailing. Even if we hypothesized an agreement whereby the for-profit enterprise devised the copy, bore the printing and postage expenses, provided the names of likely donors, and assumed all risk of loss while retaining the lion's share of any profits, such an arrangement would not, according to American Target, constitute an impermissible cooperative mailing, so long as the client's name appeared on the letterhead, that is, the solicitation letter was -- at least nominally -- the nonprofit group's "own mail." American Target asserts that nothing in the underlying statute or implementing regulations even remotely authorizes the Postal Service to define a cooperative mailing as it has in Publication 417, see supra note 3. To the extent that the subpoenas furthered an investigation into a potential violation of an invalid rule, American Target maintains that it need not have complied with them.

This line of reasoning, though cogently presented and perhaps tenable, nonetheless places the cart before the horse. Although American Target might seek to defend itself against a subsequent deficiency determination by contesting the Postal Service's interpretation of the statutory prohibition against cooperative mailings, the scope of inquiry is necessarily much narrower in a subpoena enforcement proceeding. Such proceedings "are designed to be summary in nature." United States v. Sturm, Ruger & Co., Inc., 84 F.3d 1, 5 (1st Cir. 1996); see EEOC v. American & Efird Mills, Inc., 964 F.2d 300, 303 (4th Cir. 1992) ("The [review] process is not one for a determination

_____

**4** The deficiency may be assessed against any person or organization that "mail[s], or cause[s] to be mailed by contractual agreement or otherwise" any matter ineligible for the nonprofit rate. See 39 U.S.C. § 3626(k)(1).

7

of the underlying claim on its merits; Congress has delegated that function to the discretion of the administrative agency.").

As a collateral effect of this legislative grant of discretion, targets of agency investigations are constrained to endure the trouble and expense of compliance, along with certain compromises of their privacy attendant to the disclosure of proprietary information to third parties. If the investigation ultimately uncovers no wrongdoing, the subject may, with some justification, believe itself unfairly victimized or otherwise violated. The inevitability of these sorts of unfortunate outcomes, however, is trumped by the overriding public interest in ensuring "the expeditious investigation of possible unlawful activity." FTC v. Texaco, Inc., 555 F.2d 862, 872 (D.C. Cir. 1977).

Congress has duly weighed the competing policy interests, and it has chosen in favor of the effective administration and enforcement of its laws. It is not the role of the courts to second-guess that choice. So long as the agency's assertion of authority is not "obviously apocryphal," Sturm, Ruger & Co., 84 F.3d at 5-6 (citations omitted), the first requirement of Oklahoma Press and Lockheed Martin is met. See supra at 5. Inasmuch as the Postal Service's interpretation of the Cooperative Mail Rule has been accepted by at least two federal courts, see United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 440-43 (S.D.N.Y. 1999); Univ. Publ'g Corp., 835 F. Supp. at 491, its assertion of authority is far from apocryphal, obviously or otherwise.

2.

American Target contends that, regardless of whether the Postal Service would ordinarily possess the authority to investigate potential violations of the Cooperative Mail Rule, it has no authority to exercise its investigative prerogative as a tool of intimidation and harassment. This premise finds support in the law. In United States v. Powell, 379 U.S. 48 (1964), a proceeding challenging an IRS summons, the Supreme Court declined to foreclose judicial inquiry into the motivation behind the Government's examination:

> It is the court's process which is invoked to enforce the administrative summons and a court may not permit its pro-

8

cess to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.

Id. at 58 (footnote omitted); accord, Maccaferri Gabions, Inc. v. United States, 938 F. Supp. 311, 314 (D. Md. 1995) ("[T]he government may not subvert the use of its investigative power by reason of political influence or other improper motives.") (citations and internal quotation marks omitted). The burden of demonstrating an abuse of process is on the party challenging the investigation. Powell, 379 U.S. at 58.

In furtherance of its allegation that an abuse of process occurred here, American Target advances the theory that the Postal Service commenced this investigation at the behest of Senator David Pryor, an Arkansas Democrat who is now retired. American Target notes that the solicitation letters sent on behalf of its clients frequently criticized the administration of President Clinton, leading Pryor to publicly rebuke Viguerie on the Senate floor. Speaking in support of proposed legislation to protect senior citizens, Pryor portrayed Viguerie as the driving force behind all three of the nonprofit organizations whose relationship with American Target (itself owned by Viguerie) is the focus of the subpoenas at issue. Senator Pryor opined that Viguerie, rather than being an advocate for senior citizens, was instead an "opportunist":

> His goal is to generate money for his own pocket and for his own organizations. He and other profiteers use these donations to fuel their direct mail operations across America. They get rich, while the only thing the seniors get is the thrill of having their names and addresses sold to other organizations who will ask them for more money. It is a vicious cycle and the elderly people of our country have become the victim in a national con game.

139 Cong. Rec. S6364 (daily ed. May 24, 1993) (statement of Sen. Pryor).

9

Without question, American Target has demonstrated a fair degree of hostility directed toward it by Senator Pryor. But that is not enough. American Target must show that the party actually responsible for initiating the investigation, i.e., the Postal Service, has done so in bad faith. See SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118 (3d Cir. 1981) (en banc):

> At bottom, this case raises the question whether . . . the SEC's decision to investigate reflected its independent determination, or whether that decision was the product of external influences. The reality of prosecutorial experience, that most investigations originate on the basis of tips, suggestions, or importunings of third parties . . . need hardly be noted. That the SEC commenced these proceedings as a result of the importunings of Senator Weicker or[a business competitor], even with malice on their part, is not a sufficient basis to deny enforcement of the subpoena.

Id. at 130 (citation omitted). Quite simply, there has been no showing of bad faith on the part of the Postal Service in connection with its issuance of the contested subpoenas.

American Target suggests that it might be able to make the required showing were it granted formal discovery before the district court. The general rule, however, is that such discovery is prohibited in these types of summary enforcement proceedings absent "extraordinary circumstances." See SEC v. McGoff, 647 F.2d 185, 193 (D.C. Cir. 1981) (citation omitted). To obtain discovery, the target of the subpoena or other process must "distinguish himself from the class of the ordinary respondent, by citing special circumstances that raise doubts about the agency's good faith." SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1388 (D.C. Cir. 1980) (en banc) (citations and internal quotation marks omitted), quoted in Maccaferri Gabions, 938 F. Supp. at 316.

On occasion, a respondent has sufficiently called the Government's good faith into question. In United States v. Fensterwald, 553 F.2d 231 (D.C. Cir. 1977) (per curiam), a taxpayer chosen for a "special audit" was permitted limited discovery into the selection process upon a showing that, inter alia, he was the former chief counsel to a Senate

10

committee where, in the course of his duties, he produced evidence of illegal IRS activities. Similar relief was accorded the respondent in Wheeling-Pittsburgh Steel, supra, where the district court had made specific findings that "the SEC `has permitted, and at times encouraged, the abuse of its investigating function,'" id. at 119, and that the agency's allegations of wrongdoing against the respondent were "patently frivolous," id. at 127.

The circumstances surrounding the Postal Service's investigation in this case have little in common with those in Fensterwald or Wheeling-Pittsburgh Steel. Rather, American Target's situation more closely resembles that described by the court in McGoff, supra. In that case, the respondent alleged that he had been targeted for investigation by the SEC because he was "an active and vocal conservative [who was] a fierce critic of Carter administration attitudes and policies." Id. at 188 (internal quotation marks and brackets omitted). Then-Judge Ginsburg, writing for the court, aptly observed:

> Most Americans criticize their government at one time or another and many in a position to be heard do so regularly and harshly. If strong criticism of administration policy on the part of the target of an agency investigation were sufficient to authorize inquiry into the agency's motives, little would remain of the general rule that except in extraordinary circumstances discovery is improper in a summary subpoena enforcement proceeding.

Id. at 194 (citation and internal quotation marks omitted).

We entirely agree. When presented with evidence of unlawful conduct, the Government is not bound to investigate only those potential wrongdoers who support its policies. Because American Target has failed to distinguish itself from the ordinary disgruntled respondent, it is not entitled to discovery regarding the genesis of the Postal Service's inquiry.

III.

The district court did not clearly err in determining that the Postal Service was authorized to conduct its investigation of American Tar-

11

get. We therefore affirm the lower court's order directing compliance with the administrative subpoenas.

<u>AFFIRMED</u>

12