**UNITED STATES of America,
Petitioner,**

v.

**JUDICIAL WATCH, INC., Respondent.**

No. 02–144 (ESH).

United States District Court,
District of Columbia.

Dec. 11, 2002.

Stuart David Gibson, U.S. Atty's Office, Washington, DC, for Petitioner.

Larry Elliot Klayman, Judicial Watch, Inc., Washington, DC, David Barmak, Joanne B. Jarquin, Mintz, Levin, Cohen, Ferris, Glovsky & Popeo, P.C., for Respondent.

## MEMORANDUM OPINION

HUVELLE, District Judge.

This action was commenced by petitioner, the United States of America, to judicially enforce an Internal Revenue Service (IRS) summons against respondent, Judicial Watch, Inc., pursuant to sections 7402(b) and 7604(a) of the Internal Revenue Code of 1986, 26 U.S.C. §§ 7402(b) and 7604(a). The purpose of the audit is to examine the tax-exempt status and potential tax liability of Judicial Watch for the tax periods ended December 31, 1996 through December 31, 2000. While this type of case is ordinarily characterized as a "summary subpoena enforcement proceeding," *SEC v. McGoff*, 647 F.2d 185, 193 (D.C.Cir.), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981) (citation and internal quotation marks omitted),

that has not been the case here. For, as observed by Judge Nickerson of the District of Maryland when denying Judicial Watch's motion to stay or enjoin the IRS administrative summons that underlies this action, "this is a highly unusual case that, at its heart, is about an organization seeking to stop the Internal Revenue Service from auditing it." *Judicial Watch, Inc. v. Rossotti*, 217 F.Supp.2d 618, 619 (D.Md.2002).[1]

As in the *Rossotti* action, Judicial Watch continues to argue that while it is not exempt from being audited,[2] the audit that is the subject of this suit was initiated for an illegal purpose and the summons is "retaliatory, unconstitutional and grossly overbroad." (Judicial Watch's Opposition to Petition to Enforce Summons ["JW's Opp."] at 1.) On this basis, Judicial Watch seeks to quash the summons in its entirety, or in the alternative, to obtain full discovery and an evidentiary hearing regarding the purpose for the audit.

In order to provide discovery regarding how respondent had been selected for audit,[3] the Court required the IRS to submit affidavits from the two IRS agents who

have been assigned to conduct the audit, as well as the two IRS officials who authorized the audit in December 1997, some 1,000 documents relating to Judicial Watch and the initiation and history of the audit, and the two investigations conducted in 1999 and 2000 by the Treasury Inspector General for Tax Administration ("TIGTA") regarding Judicial Watch's allegations that it had been improperly selected for audit. In addition, the parties have submitted extensive briefs and argument was held on August 1, 2002. Based upon the Court's review of these voluminous submissions and the relevant case law, the Court concludes that the audit cannot be postponed any longer; there is no evidence of political vindictiveness or a retaliatory motive, respondent's constitutional challenges are without merit, and the summons is not so overbroad as to be unlawful.

## BACKGROUND

### I. Judicial Watch and the Genesis of the Audit

Respondent Judicial Watch describes itself as a "non-profit, non-partisan ... or-

---

1. In the Maryland suit (hereinafter referred to as *"Rossotti"*), Judicial Watch sought an order enjoining the IRS from conducting a " 'retaliatory, politically-motivated audit' " of the organization, arguing that the audit violated its First Amendment rights of free speech and association and its Fifth Amendment right to due process. *Id.* at 622 (quoting Amended Complaint at 23–24). In dismissing that suit, Judge Nickerson ruled that the Anti-Injunction Act, 26 U.S.C. § 7421(a), precluded the court from exercising subject matter jurisdiction over Judicial Watch's claims for injunctive relief, and that the individual IRS officers were entitled to qualified immunity for any constitutional violations, because to subject them to harm "would grossly impede the agency's ability to investigate suspected violations....." *Id.* at 627.

2. Given the extent of Judicial Watch's lawsuits against the government, including the

current Administration, *see, e.g., Judicial Watch v. Nat'l Energy Policy Development Group*, Civil Nos. 01–1530, 02–631 (D.D.C.) (EGS); *Judicial Watch v. United States Dept. of Energy*, Civ. Nos. 01–0981, 01–2545 (D.D.C.) (PLF), one can only wonder if Judicial Watch will always argue that any audit is politically motivated.

3. As held by this Circuit in *United States v. Fensterwald*, 553 F.2d 231 (D.C.Cir.1977):

[T]he District Judge should allow some measure of discovery, preferably by specific interrogatories to be answered under oath by responsible and knowledgeable officials of the Internal Revenue Service, or *perhaps by an overall affidavit made by a similar responsible and knowledgeable official as to all relevant details of how taxpayer Fensterwald's name was selected for this audit.* *Id.* at 232–33 (emphasis added).

ganization which as a public interest law firm specializes in deterring, monitoring, uncovering, and addressing public corruption in government." *Judicial Watch, Inc. v. Department of Justice*, 185 F.Supp.2d 54, 57 (D.D.C.2002). It is a "legal 'watchdog' organization that relies on the Freedom of Information Act ("FOIA"), the civil discovery process, and court litigation[ ] ... to protect the American people from, and educate them about, corruption in government and abuses of power, and to enforce the principle that 'no one is above the law.' " [4] *Rossotti*, 217 F.Supp.2d at 619 (quoting Amended Complaint ¶ 2). It was founded in 1994, and by letter dated August 3, 1995, it obtained a ruling from the IRS that it met the requirements for tax exemption under 26 U.S.C. § 501(c)(3), which was confirmed on November 18, 1998.[5] Since then, the IRS has not completed any examination into whether Judicial Watch is in compliance with the laws governing its tax-exempt status.

By letter postmarked October 23, 1997, a recipient of a Judicial Watch fundraising solicitation wrote to the Atlanta office of the IRS questioning whether Judicial Watch should be a tax-exempt entity. (Supplemental Declaration of Daniel Rose ["Supp. Rose Decl."] ¶ 20a.) Specifically, the letter questions the political nature of Judicial Watch's activities asking, "By what stretch of the imagination can anyone solicit tax exempt donations supposedly to be used to bring a politically motivated law suit?" (United States' *In Camera* Submission at 1.) Based on the informant letter,

and because the IRS's records reflected that Judicial Watch had reported no gross receipts for the year ending July 31, 1996, the Atlanta office forwarded the letter to the IRS Classification Unit to determine whether an audit was warranted. (Supp. Rose Decl. ¶ 20b.) In doing so, the Atlanta office was following standard IRS procedure. (*Id.*)

Judicial Watch is headquartered in Washington, D.C., and therefore the IRS referral was directed to the agency's Southeast Region office, which is located in Baltimore. The regional Classification Unit received the referral on November 10, 1997. (*Id.* ¶ 20c.) Pursuant to IRS procedures, a committee of three agency branch chiefs—Joseph Barthelmes, Michael Rachael, and Don Jones—reviewed information regarding Judicial Watch to determine whether an audit was warranted. (*Id.* ¶ 20d.) The committee approved the audit on December 18, 1997. (*Id.*)

In mid–1998, Judicial Watch filed suit against the IRS on behalf of the Western Journalism Center, challenging the agency's audit of that organization. (JW's Opp. Ex. 4, Declaration of Larry Klayman ["Klayman Decl."] ¶ 11.) On September 28, 1998, Judicial Watch submitted to Congress a report on "Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office," which was accepted into the Congressional Record on October 5, 1998. (*See id.* Ex. 9.) Just four days later, Judicial Watch received a

---

**4.** As such, Judicial Watch is an enthusiastic and frequent litigant. Since its inception, Judicial Watch has filed more than 150 lawsuits. (*See* JW's Opp. at 5.)

**5.** That provision grants tax exemption to, *inter alia*, "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or

educational purposes ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, ... [or] any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).

letter from the IRS dated October 5, 1998, and signed by IRS Agent Donna Dorsey, which stated that it had been selected for an audit. (*See id.* Ex. 10.)

## II. Procedural Development

The stated purpose of the October 5, 1998 audit letter was to examine Judicial Watch's Form 990–EZ for the tax year ending December 31, 1996,[6] and the letter set forth "records [that] should be made available at the start of the examination." (*Id.* Ex. 10 at 1.) These included, *inter alia*, "[c]orrespondence files," "[a]ll books and records of your organization's assets, liabilities, receipts, and disbursements," and Judicial Watch's "[c]heck register, cancelled checks, and bank statements." (*Id.*) Attached to the letter was an additional document request in which the IRS asked Judicial Watch to itemize some of its expenses, to explain its process for selecting which cases to litigate, and to "[p]rovide the names and addresses of the directors [of] Judicial Watch and their relationship to any political party or political groups." (*Id.* at 3.)

Judicial Watch immediately resisted the audit. On October 14, 1998, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; it requested from the IRS all documents relating to Judicial Watch or its founder, Larry Klayman. *Rossotti*, 217 F.Supp.2d at 620. Respondent met with various IRS officials in late 1998 and early 1999 to discuss the audit, but was rebuffed in its attempts to meet with then-Commissioner Charles Rossotti in May 1999. *Id.*

at 620–21. In addition, Judicial Watch's complaints that the audit was retaliatory were forwarded to the TIGTA, a branch of the Department of Treasury (DOT) that is independent from the IRS. In response to these allegations, TIGTA conducted two separate investigations to determine whether the audit was retaliatory. In both cases, it uncovered no wrongdoing by the IRS or the Clinton Administration.[7] (Declaration of Steven Geary ["Geary Decl."] ¶¶ 3–6.) However, the audit was postponed pending the results of these investigations. *See Rossotti*, 217 F.Supp.2d at 621.

Judicial Watch continued to correspond with the IRS about the proposed audit in 2000. In response to allegations that the audit was retaliatory, IRS Acting Director for Exempt Organizations Steven Miller agreed to delay consideration of the audit until after President Clinton left office on January 20, 2001. *Id.* However, on January 8, 2001, the IRS sent Judicial Watch a letter stating that the audit was proceeding, and asking that the documents be submitted to the IRS by January 30, 2001. *Id.* Judicial Watch did not comply with this request, but instead submitted four additional FOIA requests to the IRS, "essentially requesting any and all documents related to Judicial Watch." *Id.* At the same time, the IRS continued to request documents from Judicial Watch in preparation for the proposed audit, and Judicial Watch continued to refuse to respond to these requests.[8] *Id.*

---

6. Form 990–EZ is a short form for the income tax return of tax-exempt organizations with less than $100,000 in gross receipts. (JW's Opp. Ex. 3, Declaration of Alan Dye. ["Dye Decl."] ¶ 7.)

7. The TIGTA reports were completed in September 1999 and October 2000. (Geary Decl. ¶¶ 4, 6.)

8. For example, on April 14, 2000, Judicial Watch sent its second FOIA request to the IRS; five days later, Judicial Watch received a renewed notice of the proposed audit with an accompanying document request. *Id.* at 621 n. 4.

In September 2001 Judicial Watch filed suit in Maryland, seeking to enjoin the audit as "retaliatory, politically-motivated, and unconstitutional." *Id.* On January 18, 2002—more than four years after the audit was authorized and over three years after the initial audit letter was sent—the IRS served Judicial Watch with an administrative summons demanding the production of documents within eight days. *Id.* at 622. Judicial Watch did not comply with the summons, but instead, it initiated suit in Maryland to stay or enjoin its enforcement. *Id.* On March 27, 2002, Judge Nickerson denied Judicial Watch's motion to stay or enjoin enforcement of the summons, and the following day, the United States filed the action currently before this Court to enforce the January 18 summons. On April 3, the Court entered an Order to Show Cause "why [Judicial Watch] should not be compelled to obey the internal revenue summons served upon it . . . ." *United States v. Judicial Watch, Inc.*, Misc. No. 02–144, Order to Show Cause (D.D.C. Apr. 2, 2002).

In response, Judicial Watch moved to stay this case pending appeal of the Maryland lawsuit. In an April 18 Order, this Court declined to stay the action, and set down a briefing schedule. The next day,

however, Judicial Watch filed an emergency motion to seal this action "to minimize the irreparable harm to Judicial Watch from the unconstitutional audit and investigation." (Memorandum in Support of Emergency Motion to Seal at 2–3.) The Court deferred ruling on the motion pending the Fourth Circuit's determination of the same issue, which ruling was issued on April 12, denying Judicial Watch's petition for rehearing of its order affirming Judge Nickerson's denial of Judicial Watch's motion to seal.[9]

Judicial Watch next moved on April 10 to have this case reassigned to Judge Lamberth as related to a 1999 FOIA action that had been filed by Judicial Watch against three government agencies, including the IRS, but was dismissed without prejudice by Judge Lamberth on June 13, 2000, for failure to prosecute. This Court denied this motion, because the instant action "did not address the same subject matter under Local Rule 40.5(a)(4)," which governs related cases.[10] *United States v. Judicial Watch*, Misc. No. 02–144, Order (D.D.C. April 12, 2002).[11]

The parties thereafter submitted extensive briefs relating to both the law and the facts. In addition to an opposition, Judicial Watch filed a surreply and a "Supple-

9. In denying Judicial Watch's motion to seal, Judge Nickerson wondered "why [ ] news of an allegedly retaliatory, politically-motivated audit of the organization would not serve to rally *additional* support from Judicial Watch contributors, who logically would hold strong objections to such allegedly unfair and improper behavior by government officials." *Judicial Watch v. Rossotti*, Civil Action No. WMN–01–2672, Order Denying Motion To Seal at 7 (D.Md. Jan. 23, 2002).

10. In earlier lawsuits, Judge Lamberth found that the Department of Commerce and the Clinton White House had acted improperly with regard to document requests by Judicial Watch. *See, e.g., Alexander v. FBI*, Civil No. 96–2123/97–1288 (D.D.C.).

11. Recently, Judicial Watch has filed a motion suggesting that the Court should voluntarily recuse on the grounds that it was previously a law partner of and is a friend of the current general counsel of the DOT, even though there is absolutely no evidence that DOT's general counsel has any involvement in this litigation, and certainly, he could not have had any role in the relevant events, since he did not become general counsel until June 2001. This latest motion was denied by the Court on December 3, 2002. *See United States v. Judicial Watch*, Misc. No. 02–144, Order (D.D.C., December 3, 2002).

ment to Opposition to Enforce Summons," which chronicles allegations of other allegedly retaliatory audits undertaken by the IRS against private foundations "known to provide financial support to many conservative programs and organizations, such as Judicial Watch ...." (Judicial Watch's Supplement to Opposition to Petition to Enforce Summons ["JW's Supp."] at 2.)

Following the receipt of these briefs, the Court ordered the IRS to "submit to the Court for *in camera* review all documents relating to its motivation and purpose for its proposed audit of Judicial Watch" and scheduled oral argument to determine whether respondent was entitled to an evidentiary hearing. *United States v. Judicial Watch*, Misc. No. 02–144, Order (D.D.C. July 9, 2002). Petitioner filed an *in camera* submission with the Court on July 16, 2002, containing: (1) a copy of the citizen letter dated October 23, 1997, that triggered the IRS decision to audit Judicial Watch and the fundraising letter the citizen received from Judicial Watch; (2) a document describing IRS procedures for deciding to open an audit of a tax-exempt organization covered by the Southeast Key District Office dated March 10, 1997; (3) various memos discussing the procedures in place at the time the citizen complaint letter was received for opening audits of tax-exempted organizations and describing the changes to those procedures that occurred in 1997 and 1998; and (4) the "classification record" and related documents reflecting the approval of the audit of Judicial Watch, including the signatures of three IRS branch chiefs who approved the audit. During a July 25, 2002 teleconference with the Court, petitioner agreed to provide this submission to respondent with personal identifiers redacted.

Following a hearing on August 1, 2002, the Court ordered petitioner to produce additional documents for *in camera* review. *United States v. Judicial Watch*, Misc. No. 02–144, Amended Order (D.D.C. August 9, 2002). Specifically, the IRS was directed to produce:

(1) All documents dated between June 1, 1997 and December 31, 2001 in the custody, control or possession of the Internal Revenue Service that reflect or relate to: (a) complaints regarding Judicial Watch, (b) a request that Judicial Watch be audited or that an audit of Judicial Watch be expanded; or (c) the purpose for any audit of Judicial Watch or the expansion of an audit of Judicial Watch;

(2) Reports of the two investigations of Judicial Watch conducted by the Treasury Inspector General for Tax Administration; and

(3) Affidavits from Joseph Barthelmes and Michael Rachael, IRS Exempt Organization Agency Branch Chiefs at the time the Judicial Watch audit was approved, and from IRS Agent Donna Dorsey.

*Id.* Petitioner was also ordered to provide these documents to defendant "with any confidential or privileged information redacted" and to file an index of all documents produced to the Court. *Id.* Petitioner's submission was divided into three parts, corresponding to the three items in the Court's Amended Order. In Tab 1, petitioner provided: (a) documents reflecting and relating to complaints regarding Judicial Watch from 23 individuals between May 22, 1997 and October 8, 2001, that were made directly to the IRS, or were forwarded to the IRS by members of Congress, or, in one case, by the White House; (b) documents prepared in connection with the defense of the *Bivens* lawsuit filed against individual IRS employees in the *Rossotti* case in Maryland; and (c) other documents relating to the ongoing audit of Judicial Watch. (United States'

Second *In Camera* Submission at 2–3.) Tab 2 contained the reports of the 1999 and 2000 TIGTA investigations, and Tab 3 contained the affidavits specified in the Amended Order. (*Id.* at 4.) With the exception of Tabs 1.B and 1.C, which were withheld under various claims of privilege, the documents were also provided to respondent with information identifying individual complainants and lower-level IRS employees redacted. *See United States v. Judicial Watch*, Misc. No. 02–144, Order (D.D.C. September 20, 2002). In total, petitioner has provided more than 1,000 documents in response to the court orders. (*See* United States' Memorandum in Opposition to Judicial Watch's Supplemental Memorandum of October 15, 2002 ["U.S. Opp."] at 1).

In addition to submitting these documents, petitioner modified one of the requests contained in the summons. Specifically, petitioner narrowed ¶ 2 of the summons so as not to require production of information concerning *all* donors, but rather only donors *who contributed $3,000 or more*. (United States' Second *In Camera* Submission at 1–2.) The Court also allowed the parties to submit additional briefs addressing issues raised by the Second In Camera Submission. *See United States v. Judicial Watch*, Misc. No. 02–144, Order (D.D.C. September 20, 2002).

Having received extensive documentation, affidavits and briefing by the parties, the Court is confronted with essentially two questions: (1) Is Judicial Watch entitled to further discovery and/or an evidentiary hearing regarding its allegations of an improper, retaliatory audit? (2) If not, should the subpoena be enforced? As discussed more fully below, the Court concludes that the first inquiry should be answered in the negative, since the discovery permitted to date does not reveal that the audit was improperly initiated or conducted, and therefore, it is unnecessary to expand the scope of discovery to include other issues or other means of discovery. As to the second inquiry, the Court concludes that it should be answered in the affirmative, since the purpose of the audit is proper, the summons (with small exception) seeks relevant documents, and there is no constitutional impediment to its enforcement.

## III. Judicial Watch's Allegations of Retaliation

### A. Purpose of the Audit

Judicial Watch's argument is two-fold. First, it asserts that the audit itself is retaliation against Judicial Watch "for its public interest legal advocacy, in violation of Judicial Watch's rights under the First, Fourth and Fifth Amendments to the United States Constitution." (JW's Opp. at 2.) In particular, Judicial Watch alleges that the audit was directed by the Clinton Administration as retaliation for Judicial Watch's persistent efforts to identify abuses of power by members of that Administration, and to hold any violators accountable. Judicial Watch also contends that the decision to audit was in retaliation for "Judicial Watch's findings that the Clinton Administration had operated a campaign of retribution and retaliation against its perceived enemies, using politically-inspired, retaliatory tax audits as a major weapon in the campaign." (*Id.* at 6.)

In support of this argument, Judicial Watch notes the timing of several key events and cites the comments of IRS officials after the audit was initiated. Judicial Watch asserts that it received the original audit letter several weeks prior to obtaining its final notice of exempt status, less than two weeks after Judicial Watch submitted to Congress its interim report recommending that President Clinton be

impeached, and only five months after it filed suit on behalf of the Western Journalism Center. Moreover, Judicial Watch contends that it was "reminded" of the audit twice in early 2000 by the IRS—both times immediately following significant developments in earlier Judicial Watch lawsuits that exposed wrongdoing by the Clinton Administration. (JW's Opp. at 11–12.) Finally, Judicial Watch notes that the IRS again contacted it about the audit after Judicial Watch undertook to obtain documents regarding a conflict of interest waiver granted to Commissioner Rossotti by the Clinton Administration. Judicial Watch alleges that the IRS called to remind it of the audit "[o]nly a few weeks after responses were due to these FOIA requests," and then served another audit notice "approximately three weeks after Judicial Watch filed suit" regarding this matter.[12] (*Id.* at 14.)

Judicial Watch also cites the comments of several IRS officials as evidence that the audit was retaliatory. On November 23, 1998, Dorsey—the agent who had signed the initial audit letter—told counsel for Judicial Watch that the audit was a "hot potato." (Dye Decl. ¶ 8.) At a January 12, 1999 meeting between Judicial Watch representatives and IRS officials, IRS Agent Peter Breslan stated, in discussing the propriety of the audit, "What do you expect when you sue the President?" (Dye Decl. ¶ 9.) On May 4, 1999, Judicial Watch contends that IRS Baltimore District Director Paul Harrington

stated that the political affiliations of Judicial Watch board members would be relevant to the audit. (*Id.* ¶ 11.)[13] At another meeting on June 17, 1999, Miller "conceded that the IRS's conduct had created at least the appearance of a 'problem,' but claimed he was powerless to stop the audit." (Klayman Decl. ¶ 22.)

In addition, Judicial Watch cites as evidence of political retaliation an August 14, 1998 e-mail from a private citizen to the President, which was forwarded in September 1998 to IRS Commissioner Rossotti's office, as well as numerous letters from private citizens to members of Congress that were forwarded to the IRS. The letters, like the initial informant letter that triggered the audit, raised questions about Judicial Watch's tax exempt status in response to the highly partisan fundraising solicitations received by these citizens.

### B. The Scope of the Summons

Judicial Watch's second main argument is that the audit is overly burdensome, and that the scope and breadth of the audit have increased dramatically since the initial request in retaliation for Judicial Watch's efforts to resist the audit. While the initial request related only to a single tax year—1996, the most recent summons covers five years—1996 through 2000—and requests some records dating back to 1994 and 1995. (*See* Summons at 2–3.) Moreover, the document requests in the current summons are much broader than those contained in the original audit letter.[14]

12. Judicial Watch's FOIA suit for documents related to Commissioner Rossotti's conflict of interest waiver was dismissed by this Court for failure to exhaust administrative remedies and to pay the required fee. *See Judicial Watch v. Rossotti*, Civil No. 01–1612, Order (D.D.C. March 18, 2002).

13. The initial notice of audit included a request for "the names and addresses of the directors and their relationship to any politi-

cal party or political groups." (JW's Opp. Ex. 10.) That request, however, is not included in the summons the IRS is now seeking to enforce.

14. On April 19, 2000, Judicial Watch received a second notice of the planned audit, which included an expanded list of 38 separate document requests. (JW's Opp. Ex. 15.) That document request was also included with the third notice of an audit, which Judicial Watch

(*See* Summons at 1, 3; *compare generally* Summons *with* JW's Opp. Ex. 10.) Judicial Watch argues that such requests are not only overbroad, but also raise issues of attorney-client privilege.

In support of its opposition, Judicial Watch has submitted the declaration of Donald Alexander, a former IRS Commissioner, who has averred that "the breadth and scope of the IRS's audit and the information and document requests accompanying the audit notices to Judicial Watch are significantly greater than what is usually encountered with IRS audits of 501(c)(3) organizations and beyond any audit I have been involved with in my career as a tax practitioner; and [ ] the IRS's summons and document information requests to Judicial Watch in connection with the audit are excessively broad and overreaching in their scope." (JW's Opp. Ex. 1, Declaration of Donald Alexander ["Alexander Decl."] ¶ 7.) Judicial Watch contends that these requests are purely retaliatory, and do not further any legitimate purpose or tax enforcement objective.

## LEGAL ANALYSIS

### I. Standard of Review

■ The standards for enforcement of an IRS summons are well-established. To establish a prima facie case for enforcement, the IRS "must establish that its use of the summons is 'in good-faith pursuit' of the purposes authorized by Congress." *United States v. Samuels, Kramer and Co.*, 712 F.2d 1342, 1344 (9th Cir.1983) (quoting *United States v. LaSalle National Bank*, 437 U.S. 298, 318, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978)). To do so, the IRS

must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner [of the IRS's] possession, and that the administrative steps required by the [IRS] Code have been followed [with respect to issuance and service of the summons].

*United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). "A prima facie case for the Government's need for judicial enforcement is established by a 'minimal' showing that the good-faith requirement has been met." *Samuels*, 712 F.2d at 1344–45 (quoting *United States v. Moon*, 616 F.2d 1043, 1046 (8th Cir.1980)). *See also Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987) ("No probable cause standard need be met.... The government's burden is fairly slight because this is a summary proceeding. It occurs only at the investigative stage of an action against the taxpayer, and 'the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted' ") (quoting *United States v. Kis*, 658 F.2d 526, 536 (7th Cir.1981)).

The declarations of Daniel Rose meet this minimal burden. First, Rose asserts that the audit is being conducted for a legitimate purpose—to determine "whether the respondent has operated within the laws that govern its grant of tax exemption," and "to determine whether [Judicial Watch] is a public charity or a private foundation." [15] (Supp. Rose Decl. ¶¶ 6, 8.)

---

received on January 8, 2001. (JW's Opp. Ex. 17.) The current summons contains a different list of 26 requests.

15. Organizations that qualify for tax exemption under 501(c)(3) may be either a public charity or a private foundation. Public char-

ities generally either have broad public support or actively support other charitable organizations having broad public support. *See* I.R.C. § 509(a)(1)-(4). Organizations that qualify for tax exemption under 501(c)(3) but that do not qualify as public

Second, Rose notes that "[a]ll the information sought in the audit pertains to issues [ ] which are normally considered in the audit of tax-exempt organizations," relate to Judicial Watch's status as a public-interest law firm,[16] or were "raised by the tax returns that the respondent has filed for the years under audit." (Supp. Rose Decl. ¶ 4; *see id.* ¶¶ 12–19.) Third, the Rose Declaration states that none of the information sought is in the possession of the IRS. (Rose Decl. ¶ 13.) Finally, Rose observes that the IRS complied with all required administrative steps in issuing the summons. (*Id.* ¶ 14.) (*See also* Declarations of Joseph Barthelmes ["Barthelmes Decl."], Michael W. Rachael ["Rachael Decl."], and Donna Dorsey ["Dorsey Decl."], United States' Second *In Camera* Submission, Tab 3.)

## II. Judicial Watch's Burden

### A. Right to Discovery

 Because the IRS has established a prima facie case for enforcement by presenting the affidavits of knowledgeable IRS personnel who have attested to the

Powell good-faith elements, the burden shifts to the respondent to introduce some evidence to support its allegations of bad faith on the part of the government. The burden on a party resisting the IRS's prima facie showing is "a heavy one." *United States v. LaSalle National Bank*, 437 U.S. at 316, 98 S.Ct. 2357. The only *Powell* elements seriously disputed here are whether the IRS's investigation was conducted pursuant to a legitimate purpose and whether the information sought from respondent is relevant to that investigation.[17] In particular, with respect to the legitimacy of purpose prong, Judicial Watch cites to the chronology of events, the comments of IRS agents and officials, the Dorsey declaration, and the citizen complaints that were forwarded to the IRS by the White House and by members of Congress. Based on this evidence, it argues that the Court should quash the summons, or at a minimum, grant "full blown unlimited discovery" and an evidentiary hearing. (*See* August 1, 2002 Transcript of Hearing at 21.)

 Respondent's position as to its entitlement to discovery and an evidentia-

---

charities are classified as private foundations. Private foundations are supervised closely and are subject to excise taxes and penalties for engaging in certain prohibited acts. In addition, contributions to private foundations receive less favorable tax treatment than contributions to public charities. (*See* Supp. Rose Decl. ¶¶ 7, 11.)

16. Litigation in and of itself is not considered to be in furtherance of a charitable purpose. Consequently, charitable organizations that litigate must establish that its litigation is in furtherance of a charitable purpose. To do so, they generally adhere to guidance set out in Rev. Proc 92–59 for public interest law firms. Public interest law firms are recognized as charitable "based on their provision of legal representation for the resolution of issues of broad public importance where such representation is not ordinarily provided by private law firms because the cases are not

economically feasible." Rev. Proc. 92–59 § 2.02.

17. It is undisputed that the IRS followed the required administrative steps with respect to the issuance and service of the summons. (Rose Decl. ¶ 14.) With respect to the third prong of the test, Judicial Watch argues that some of the documents requested—specifically, Forms W–2, W–4, W–9, 1099, and 8283—are already in the possession of the IRS. These forms were not, however, filed by Judicial Watch; rather, they were filed by the individual donors or beneficiaries of the organization, and the IRS cannot identify these documents without combing through millions of tax returns. So while this information is technically within the IRS's possession, it is not within the agency's possession under the third prong of the *Powell* test. *See United States v. First National State Bank of New Jersey*, 616 F.2d 668, 673–75 (3d Cir.1980).

ry hearing has absolutely no support in the case law, and in particular, it is antithetical to this Circuit's law.[18] While there appears to be some differences among the circuits regarding whether a taxpayer is entitled to a limited evidentiary hearing, it is clear that the Court has discretion to limit the scope of discovery and that the right to a hearing is not absolute. *See, e.g., Alphin,* 809 F.2d at 238; *United States v. Harris,* 628 F.2d 875, 879 (5th Cir.1980); *United States v. Nat'l Bank of S. Dakota,* 622 F.2d 365, 367 (8th Cir.1980) ("The district court has discretionary authority under Rule 81(a)(3) of the Federal Rules of Civil Procedure and may deny hearings or limit the applicability of discovery in a summons enforcement proceeding."); *United States v. Stuckey,* 646 F.2d 1369, 1373 (9th Cir.1981) ("The district court has discretionary authority to limit the scope of an evidentiary hearing and to deny discovery in a summons enforcement proceeding."). However, controlling precedent in this Circuit provides no basis for suggesting that either unlimited discovery or an evidentiary hearing is warranted even if the respondent has sufficiently called the government's good faith into question. Rather, this Circuit begins with the general rule that discovery is prohibited in these types of summary enforcement proceedings absent " 'extraordinary circumstances.' " *SEC v. McGoff,* 647 F.2d at 193 (citation omitted). And where a target of a subpoena is able to "distinguish himself from the class of the ordinary respondent, by citing special circumstances that raise doubts about the agency's good faith," *SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1388 (D.C.Cir. 1980) *(en banc )* (citations and internal quotation marks omitted), only "limited discovery," not an evidentiary hearing, is

permitted regarding "how his name came to be selected for this special audit." *Fensterwald,* 553 F.2d at 232.

In *Fensterwald*—the seminal case in this jurisdiction—the taxpayer was an attorney who represented a number of prominent clients, including Watergate defendants, in politically controversial cases adverse to the government and also served as counsel to a congressional committee investigating alleged illegal activities of the IRS. *Id.* The Circuit Court, finding that taxpayer was entitled to take limited discovery directed to the issue of how his name was selected for audit, ordered that defendant should be allowed to engage in *"discovery procedures deemed appropriate by the District Court...."* *Id.* at 233 (emphasis added). On remand, taxpayer filed ten interrogatories. *United States v. Fensterwald,* 1978 WL 1155, *1 (D.D.C.1978) (Flannery, J.). "The first five questions requested explanatory information regarding the [audit] and the way in which computers ... select names such as defendant's for audit .... The last five questions seem to be aimed at discovering whether the I.R.S. had engaged in any harassment of the defendant." After reviewing the answers provided by the IRS, the court concluded that the "defendant has been given more than enough discovery in this case." *Id.* at *2.

Similarly, in *Miller v. Alexander,* 1977 WL 1855 (D.D.C.1977) (Gasch, J.), plaintiff charged that an IRS audit was designed to punish and harass him for his political activities rather than to collect legitimate taxes. As observed by Judge Gasch, "[i]t is clear from ... [the *Fensterwald* ] opinion ... that the loose rein normally granted a plaintiff in discovery matters is to be significantly tightened when the plaintiff challenges the propriety of an IRS audit of

---

18. Even respondent's counsel admitted at the August 1 hearing that he was unaware of any

case that granted "civil discovery" in the ordinary sense. *(Id.)*

his tax returns." *Id.* at *3. Consistent with that recognition, the court denied many of the proposed interrogatories and limited plaintiff's discovery only to those interrogatories that addressed the question of how plaintiff's name was selected for the audits. *Id.* at *2. As recognized by the court:

> Plaintiff is not prejudiced by this restriction on discovery. Should the permitted discovery reveal that the audits were not properly initiated, then the Court can expand the scope of discovery to include other related issues. If, however, the requested audits turn out to have been legitimate, needless burdens and costs of discovery will have been avoided and a proper investigation will not be further delayed or jeopardized.

*Id.* at *3.[19]

Given this Circuit's unwillingness to order either an evidentiary hearing or broad-ranging discovery, this Court must reject Judicial Watch's grandiose demands to convert this summary enforcement proceeding into a full-blown civil proceeding.[20] Rather, applying the governing principles

articulated by the Circuit in *Fensterwald,* the Court ordered that the IRS file affidavits from "responsible and knowledgeable official[s] as to all relevant details of how taxpayer['s] ... name was selected for this audit." *Fensterwald,* 553 F.2d at 232–33. In addition, the Court went beyond the *Fensterwald* requirements and ordered the IRS to produce all documents relating to the purpose for the audit, as well as its expansion; any complaints received by the IRS regarding Judicial Watch; and the two TIGTA reports from 1999 and 2000.

## B. Propriety of the Audit

■ Based on these materials, the Court is persuaded that the audit was conducted in accordance with normal IRS procedures, and was not, as respondent may well believe, the result of a conspiracy between the White House and the IRS to retaliate against Judicial Watch for its political advocacy. In reaching this conclusion, it is most telling to note that the initial decision to audit Judicial Watch was made in December 1997—some nine

---

**19.** In the face of this jurisdiction's extremely narrow view of permissible discovery and the lack of any authority here to support a request for an evidentiary hearing, Judicial Watch relies on cases from other jurisdictions to support its expansive view. (*See* Respondent's Supplemental Memorandum in Response to United States' Second *In Camera* Submission ["Resp.'s Supp. Mem."] at 8–9 (citing *United States v. Amerada Hess Corp.,* 619 F.2d 980 (3d Cir.1980); *United States v. Wright Motor Co.,* 536 F.2d 1090 (5th Cir. 1976)).) First, these cases are at odds with the controlling precedent in this jurisdiction. Second, they involve a different issue, since the taxpayers were also under criminal investigation, and thus, had the right to challenge the IRS's use of its subpoena power as being violative of *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), which prevents the IRS from using its power for the sole purpose of obtaining evidence for a criminal prosecution.

**20.** Courts have consistently held that courts may limit the application of the Federal Rules of Civil Procedure "when to apply them literally would impair the summary nature of the proceeding." *Alphin,* 809 F.2d at 239. *See also Donaldson v. United States,* 400 U.S. 517, 528–29, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding .... But [they] ... are not inflexible .... Rule 81(a)(3) goes on specifically to recognize that a district court, by local rule or by order, may limit the application of the rules in a summons proceeding."); *Wright Motor Co.,* 536 F.2d at 1095 ("the latitude applicable to a summons enforcement proceeding is more restricted than that permitted under the broad discovery authorized by Rule 26"); *United States v. Newman,* 441 F.2d 165, 169–70 (5th Cir.1971) (district court may limit the application of the Federal Rules of Civil Procedure in a summons proceeding.)

months before Judicial Watch filed its report seeking the impeachment of President Clinton and some six months before Judicial Watch filed suit against the IRS on behalf of the Western Journalism Center. (*See* Klayman Decl. ¶ 11.) This simple chronology exposes the weakness in respondent's position. The evidence also clearly indicates that the audit was triggered by an informant letter from a citizen with no connection to any of respondent's supposed political adversaries. In fact, the author of this letter was interviewed during the course of the first TIGTA investigation, and it was confirmed that "no one suggested or directed him to send the letter to the IRS."[21] (*See* September 1999 TIGTA Report of Investigation, Notice of Filing on the Public Record, Tab 2(A) at 35.)

In addition, the affidavits of the four IRS employees support the conclusion that the IRS audit of Judicial Watch was a result of the citizen complaint letter, not any political pressure by the Clinton Administration. As is clear from their affidavits, they did not know or recognize the name of the person whose complaint triggered the IRS decision to audit—or any of the other citizens who wrote to complain about Judicial Watch. Moreover, they (1) had no contact with any elected or appointed official about the audit, (2) had not heard of Judicial Watch before either authorizing or conducting the audit; (3) did not know of, or follow, Judicial Watch's efforts to impeach former President Bill Clinton; and (4) had no personal animus against Judicial Watch before the audit began and have no personal animus against Judicial Watch as a result of its conduct during the audit. (U.S. Opp. at 4–5; *see also* Rose Decl., Barthelmes Decl., Rachael Decl., and Dorsey Decl.)

This matter was also the subject of two thorough investigations by the TIGTA. These investigations found no support for the allegation of political intervention in the selection of Judicial Watch. (*See* September 21, 1999 and October 7, 2000 TIGTA Reports of Investigation, Notice of Filing on Public Record, Tab 2(A) and (B).) These conclusions were further corroborated by the March 2000 report of the Staff of the Congressional Joint Committee on Taxation, which concluded:

> The Joint Committee staff found no credible evidence that the IRS delayed or accelerated issuance of determination letters to tax-exempt organizations based on the nature of the organization's perceived views.

> \* \* \* \* \* \*

> The Joint Committee found no credible evidence of intervention by Clinton Administration officials (including Treasury Department and White House officials) in the selection of (or failure to select) tax-exempt organizations for examination.

Report of Investigation of Allegations Relating to Internal Revenue Service Handling of Tax–Exempt Organization Matters at 6–7 (March 2000).

Finally, there is nothing before the Court to suggest that Commissioner Rossotti, any White House official, or any political supporter of the Clinton Administration improperly influenced the IRS employees involved in the audit. Three of the IRS employees involved with the audit have never even met or spoken with the Commissioner. It is also significant to note that even though the Executive Branch is no longer under the control of President Clinton or the Democratic Party, and the IRS is no longer headed by a Clinton appointee (Commissioner Rossotti

---

**21.** Other informants were interviewed by the TIGTA with similar results. (*Id.*)

recently left his job),[22] petitioner has continued its efforts to conduct this audit. Moreover, even if one could argue that President Clinton or his political advisors, including James Carville,[23] harbored some animus toward respondent, "that is not enough.... [Respondent] must show that the party actually responsible for initiating the investigation, *i.e.*, the [IRS] has done so in bad faith." *United States v. American Target Advertising Inc.*, 257 F.3d 348, 355 (4th Cir.2001). This has not been done here, for there has been no showing of bad faith on the part of the IRS or its employees.

To rebut this persuasive evidence, Judicial Watch sets forth a lengthy chronology of events and various comments attributed to IRS officials in an effort to create an inference that the audit was politically motivated. However, these same facts were considered by Judge Nickerson in the *Rossotti* action, and his response to this evidence is equally relevant here:

> [A] plausible reading of the Amended Complaint is that the I.R.S., upon discovery of Plaintiff's earnest efforts to assist in the impeachment of President Clinton, became legitimately suspicious as to whether Judicial Watch was operating within the confines of § 501(c)(3) as it relates to prohibited political activity .... Plaintiff's chronology of events, while intended to show a pattern of retaliation, also reveals that from 1998 to the present, Judicial Watch frequently

criticized or sued members of the Clinton administration, and the I.R.S. continued to pursue the audit by various means.

\* \* \* \* \* \*

The overriding, insurmountable problem for Plaintiff's claims is that the political speech for which it claims to be "punished" and "singled out" is exactly the type of activity that may legitimately cause it to lose tax-exempt status under § 501(c)(3), which requires that organizations "not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office," and that "no substantial part of [its] activities is carrying on propaganda, or otherwise attempting, to influence legislation." 26 U.S.C. § 501(c)(3).

As to Defendants Rossotti, Dorsey, and Miller.... [t]hese allegations could just as easily be interpreted, however, as evidence of Defendants' efforts to enforce I.R.S. statutes and regulations. In its attempt to show a causal connection between its actions and the behavior of these Defendants, Plaintiff presents a chronology of events that reveals Judicial Watch's persistence in resisting the audit and the I.R.S.'s persistence in pursuing it. On the facts presented by Plaintiff, therefore, these Defendants are entitled to qualified immunity.

---

**22.** According to respondent, at one point it suggested that the audit be postponed until such time as a Commissioner of Internal Revenue not appointed by the Clinton Administration could determine whether the proposed audit was necessary or appropriate. (Klayman Decl. ¶ 35.)

**23.** Judicial Watch makes much of a document obtained from James Carville in which it is advocated that "the media food chain" be exposed and it be demonstrated "how right-

wing foundations ... [which include some that have supported Judicial Watch] provide funding for much of the Republican attack machine." (JW's Opp. Ex. 6.) However, this document makes no suggestion that the IRS should be used in any way to further the objectives set forth in the memo, nor is there any evidence that any Clinton advisor or supporter ever made any improper overtures to anyone involved in the audit.

This Court is confronted with a more difficult decision regarding Defendants Breslan and Hamper. Taking Plaintiff's allegations as true, Defendant Breslan's comments at the November, 1998 meeting,[24] and Defendant Hamper's warnings that Plaintiff was still on the I.R.S. "radar screen," could constitute evidence of bad faith or retaliation by those agents. It is equally plausible, however, that their comments reflect the agents' reasonable suspicions that Judicial Watch was operating outside the confines of § 501(c)(3).

*Rossotti*, 217 F.Supp.2d at 623, 626.

Respondent also argues that the declaration of Donna Dorsey, the IRS agent who signed the initial October 5, 1998 audit letter provides direct evidence of the retaliatory nature of the audit. In support of this conclusion, respondent notes that Dorsey reported that when her supervisor assigned her to conduct the Judicial Watch audit, "he told [her] that Judicial Watch's founder, Larry Klayman, had filed suit against the IRS over the Service's decision to audit another tax exempt organization. Because of that experience ... Mr. Jones directed [her] to coordinate work on the Judicial Watch audit with IRS District Counsel in Baltimore." (Dorsey Decl. ¶ 6.) There is nothing in this statement or in the act of coordinating work on the audit with IRS legal counsel that suggests any political vindictiveness. Rather, it reflects a complicated situation requiring special care to ensure that the audit process is conducted properly and lawfully. Dorsey also reported that the delay between the authorization of the audit in December 1997 and its assignment to Agent Dorsey in July 1998 was not out of the ordinary, for it was "not unusual for a six- to eight-month period to elapse between the time the IRS authorized an exempt organization audit, and the time the case was first assigned to a revenue agent." (Dorsey Decl. ¶ 5.) There is thus no basis to draw a nefarious inference from the delay in the audit's commencement.

Finally, Judicial Watch relies heavily on the fact that an e-mail from a private citizen to the White House was forwarded to the IRS Commissioner's office in September 1998, a few weeks before Judicial Watch received its initial audit letter from the IRS. Like the informant letter that initially triggered the audit, the citizen who wrote the e-mail had received an "obviously partisan" fundraising letter from Judicial Watch and was questioning its tax exempt status. (JW's Bench Memo. Ex. A at 3.) The e-mail was then forwarded by the White House to the IRS Commissioner's office, which in turn sent it to the IRS's Exempt Organization Division in Maryland, the IRS office that initiated the audit. (*Id.* at 3.) There is no indication that this process was anything other than standard operating procedure for directing a citizen's letter to the appropriate governmental agency. There is no cover note from the White House directing the IRS Commissioner to initiate an audit. Nor is there any indication that the Commissioner himself was even aware of this letter.[25] The e-mail does not create a "link" be-

24. Breslan explained this comment to the TIGTA investigator—"the statement [was made] in the context of Judicial Watch, Inc.'s advertisements that solicited donations in order to support their filing of lawsuits against the President" and "[b]ased on his experience, it is not unusual for an organization like Judicial Watch.... that gets so much media attention, to receive inquiries from people questioning the organization's motives." (October 2000 TIGTA Report, Notice of Filing on the Public Record, Tab 2(B) at 22.)

25. The Court cannot agree with Judicial Watch's argument that the White House referral of the e-mail to the IRS violated 26 U.S.C. § 7217, which prohibits the President or any employee of the executive office of the Presi-

tween the Clinton White House and the IRS (Bench Memo. at 4), nor does it suggest an improper motive for the IRS audit. Similarly, there is nothing improper about members of Congress forwarding similar letters from their constituents to the IRS. A Congressman's request that the IRS's Tax–Exempt Organization Division take "appropriate action" (Bench Memo. Ex. C at 3) or "necessary action and response" (Resp.'s Supp. at 4) does not suggest anything more than efforts by members of Congress to represent their constituents by responding to their concerns and by forwarding them to the appropriate agency for response.

In sum, there is simply insufficient evidence to support Judicial Watch's argument that this audit was commenced for an improper purpose. Without substantially more, one cannot immunize respondent from audit based on its criticisms and suits against the government. For, as observed by this Circuit in *McGoff*:

> Most Americans criticize their government at one time or another and many in a position to be heard do so regularly and harshly. If strong criticism of administration policy on the part of the target of an agency investigation were sufficient to authorize inquiry into the agency's motives, little would remain of the general rule that "except in extraordinary circumstances discovery is improper in a summary subpoena enforcement proceeding."

647 F.2d at 194 (citation omitted).

### C. Donor Information

▮▮▮▮ Judicial Watch also challenges the IRS request for donor information,

arguing that this request is overbroad and that by compelling disclosure of such information, the summons violates its First Amendment rights.[26] The summons initially requested the names and addresses of all donors who made monetary and non-monetary contributions to Judicial Watch from 1996 through 2000 and the amount or value of their contribution. (Summons ¶¶ 1–2.) The IRS has now limited this request to only those donors whose contributions have a value of $3,000 or more. Moreover, tax laws and regulations require tax-exempt organizations to report annually to the IRS "the total of all contributions and gifts received by it during the year," 26 U.S.C. § 6033(b)(5), and to list "the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more (in money or other property) during the taxable year." Treas. Reg. § 1.6033–2(a)(2)(ii)(f). While there is a gap between what is required of all tax-exempt organizations and the donor information currently requested by the IRS, the gap does not amount to an infringement of Judicial Watch's First Amendment rights.

Judicial Watch argues that "maintaining the privacy of [its] members is vital to protecting their freedom to associate" (JW's Opp. at 23) and suggests that "[t]o prevent the IRS from chilling First Amendment rights to freedom of speech, association and religion, courts have applied this doctrine to quash IRS Summonses and investigations seeking information about members and sympathizers of

---

dent from requesting, "directly or indirectly," that the IRS conduct an audit of a particular taxpayer. The forwarding of an e-mail does not amount to such a request.

26. Judicial Watch also argues that the audit and summons violate its rights to due process and equal protection. (JW's Opp. at 25–26.)

As discussed above, the IRS had a proper purpose for auditing Judicial Watch. Thus, Judicial Watch's argument (*id.* at 26) that it is being subjected to selective prosecution in violation of the Fifth Amendment must be rejected.

churches, political groups, and organizations that are critical of government." (*Id.* at 23.) Judicial Watch points to *United States v. Church of World Peace,* 775 F.2d 265 (10th Cir.1985), to support this argument. In *Church of World Peace,* the. enforcement of a portion of an IRS summons requesting a list of members of a church and names for whom marriage ceremonies were performed was denied on First Amendment grounds. *Id.* at 267–68. That case is distinguishable. First, in *Church of World Peace,* the court determined that appellant had established a factual basis for a First Amendment claim by showing that the IRS had audited *all known members* of the church and that the additional names were requested so that they too could be audited. *Id.* at 266 (emphasis added). The government did not challenge this statement. *Id.* The fact that *some* of Judicial Watch's financial backers may have been audited does not create an equivalent factual basis for such a claim. Nor does Judicial Watch's unsupported assertion that "donors regularly express concern over whether they will be subjected to retaliatory audits if they make contributions to Judicial Watch." (Klayman Aff. ¶ 53.) In addition, the government here has shown a need for the information that is relevant to its legitimate purpose (*i.e.,* that the sources of the organization's support are needed to determine if the organization is complying with the tax laws governing its tax-exempt classification.) (*See* U.S. Reply at 7, 14–15.) Second, the standard for proving that documents are relevant to the IRS's inquiry is higher for churches than for other tax-

exempt organizations. " 'The second prong of the *Powell* test was pruned back by Congress in 1969, in regard to the examination of churches, when it added subsection (c) to 26 U.S.C. § 7605. That provision limits the inquiry into religious activities and books of account of churches 'to the extent necessary' to ensure that the organization is a church and to determine the amount of tax owing. The 'extent necessary' syntax is certainly more restrictive than the 'may be relevant' language in the second tier of *Powell.*' " *Church of World Peace,* 775 F.2d at 268 (quoting *United States v. Holmes,* 614 F.2d 985, 988 (5th Cir.1980)).[27]

Further, courts have enforced IRS summonses that require churches to reveal their membership lists. For instance, in *Free United Mission Mother Church v. United States,* 1985 WL 5949 (D.D.C. 1985), Judge Gesell found that "[a]ny disclosure of petitioners' membership that might be incidental to turning over the requested financial records does not justify thwarting an IRS investigation" and that the church-petitioners' contention that the summons "infringes on their freedom of religion, association and speech [was] ... wholly frivolous." *Id.* at *1. *See also United States v. Freedom Church,* 613 F.2d 316 (1st Cir.1979) (rejecting claim that IRS request for membership and contributors lists violates church congregants' First Amendment right to freedom of association); *Pleasant v. Lovell,* 974 F.2d 1222 (10th Cir.1992) (same); *Goldberg v. United States,* 586 F.Supp. 92 (D.Md.1984) (same).

27. Judicial Watch's reliance on *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), is also misplaced. That case did not involve an IRS request for membership information to determine tax compliance but a demand by the State of Alabama that the NAACP reveal the names and addresses of all its Alabama members and agents as part of an effort to prevent the organization from operating in the State. The State's demand was found to be a denial of due process and a violation of the members' First Amendment right to freedom of association. *Id.* at 462, 78 S.Ct. 1163.

## C. Relevance of Requested Documents

 Judicial Watch also argues that the summons is overbroad insofar as it requests documents that are not relevant to any legitimate purpose. (JW's Opp. at 27–33.) "The IRS' power to investigate under section 7602 [of the Internal Revenue Code] is 'broad' and 'expansive.'" *La Mura v. United States*, 765 F.2d 974, 979 (11th Cir.1985) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)). While enforcing an unclear and overly broad summons violates the Fourth Amendment's proscription against unreasonable searches and seizures, "a district court's determination that a summons is overbroad or unclear is generally within its discretion." *United States v. Malnik*, 489 F.2d 682, 687 n. 4 (5th Cir.1974). Notably, "[t]he fact that the records called for [are] extensive is not material" to this determination. *United States v. Luther*, 481 F.2d 429, 433 (9th Cir.1973) (summons requesting "[c]ash receipts journals, cash disbursement journals, general ledgers, general journals, subsidiary journals, real estate and depreciation ledgers, chart of accounts, records of contributions, bank statements, cancelled checks, copies of deposit tickets, check vouchers, check stubs, corporation minutes books, correspondent files, paid bills and invoices and any other records relating to the income and disbursements" of the taxpayer for five tax years is not overbroad). Clearly, the IRS is "not to be given unrestricted license to rummage through the office files of an accountant in the hope of perchance discovering information that would result in increased tax liabilities for some as yet unidentified client." *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir.1973) (summons asking an accountant for copies of the tax returns and papers pertaining to the returns of all clients for three years was "deemed unreasonable and unenforceable" because it was "overbroad and disproportionate to the end sought"). However, the need to protect against "a rambling exploration" by the IRS is "particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation." *Id.*

 There is no "third party" involved in the matter before the Court. Rather, the IRS request at issue is directed solely to the taxpayer being audited. Moreover, the government argues that all the information sought in the summons is relevant to a legitimate purpose—examining the tax-exempt status and potential tax liability of Judicial Watch. (Petition ¶ 6.) While the documents requested are extensive,[28] there is little to suggest that the summons is a "rambling exploration" or that its breadth reflects harassment. As

28. The Summons includes requests for donor information, ¶¶ 1–2; litigation selection information, ¶ 3; financial records, ¶ 4; expense allocation information, ¶ 5; travel records, ¶ 6; records reflecting sales of merchandise, ¶ 7; records reconciling the tax returns to the books, ¶ 8, mass public correspondence, ¶ 9; documents reflects sales and exchanges of mailing lists, ¶ 10; audited financial statements, ¶ 11; non-monetary contribution reports, ¶ 12; forms W–4 and W–9, ¶ 13; forms W–2 and 1099, ¶ 14; internal written correspondence, ¶ 15; board members and committee members, ¶ 16; amendments to articles of incorporation and by-laws, ¶ 17; contracts, ¶ 18; client agreements, ¶ 19; employee compensation information, ¶ 20; officer, director and trustee information, ¶ 21; information identifying attorney, paralegal and other non-employees compensated, ¶ 22; outgoing and incoming correspondence, ¶ 23; tax return attachments required for public interest law firms, ¶ 24; website content, ¶ 25; documents reflecting related entities, ¶ 26. (*See* Summons.)

averred by IRS Agent Rose, the information is needed for a legitimate purpose—to determine whether Judicial Watch is a private foundation or a public charity and whether it is meeting the requirements of a public interest law firm.[29] (Supp. Rose Decl. ¶ ¶ 8–13.)

 In addition, the requests for information for tax years 1994 and 1995 are not barred by the fact that these years are not under audit and are ordinarily treated as closed under the applicable three-year statute of limitations.[30] It is proper to request information pertaining to closed tax years if that information is being used to assess the tax liability of the taxpayer for tax years still within the statute of limitations.[31] *Universal Life Church, Hidden Valley Congregation v. United States*, 573 F.Supp. 181, 184 (W.D.Va.1983). Moreover, a request for documents for years prior to the taxable

years in question is proper if there is a showing that the information in those documents "might throw light on the correctness" of the taxpayer's tax liabilities for the years under audit. *United States v. Goldman*, 453 F.Supp. 508, 512 (C.D.Cal. 1978).

Here, Agent Rose has explained that it is necessary to examine the organization's sources of support for the four years preceding the focus of the audit in order to determine whether the organization is a private foundation or a public charity. *See* Treas. Reg. § 1.509(a)–3(c). It is also necessary to examine the organizational costs allocated to legal functions during this period in order to determine whether it meets the requirements for exemption of public interest law firms in the years under investigation. *See* Rev. Proc. 92–59 § 4.05. Thus, the information is, in fact, needed to assess the tax liability of Judi-

---

29. Judicial Watch asserts that the document requests in ¶ 3 and ¶ 24 of the summons, which pertain to Rev. Proc. 92–59, are irrelevant because Judicial Watch is not a public interest law firm governed by these rules. Instead, it asserts that it is exempt as an "old line litigating organization" engaged in "social welfare and public interest." (Judicial Watch's Surreply to United States' Reply Memorandum in Support of Petition to Enforce Administrative Summons at 12.)

Human and civil rights organizations that engage in litigation may be deemed charitable organizations if their primary activity is to protect and defend "human and civil rights secured by law." *See National Right to Work Legal Defense v. United States*, 487 F.Supp. 801 (E.D.N.C.1979). *Compare id.* (organization whose primary activity is to provide legal aid to workers who suffer discrimination through compulsory unionism arrangements is a charitable organization because its primary activity is to protect and defend the right to work, a fundamental right) *with Retired Teachers Legal Defense Fund v. Commissioner of Internal Revenue*, 78 T.C. 280, 1982 WL 11193 (1982) (organization protecting the financial stability of the New York City Teachers' Retirement System is not charitable orga-

nization because it serves private interests of its members and not "human and civil rights").

Judicial Watch's litigation aims to "hold responsible parties accountable" for "corruption in government and abuses of power" (JW's Opp. at 5)—not to protect and defend fundamental human and civil rights. Thus, Judicial Watch cannot argue that it is exempt from producing information needed to evaluate its compliance with Rev. Proc. 92–59.

30. These are the requests contained in ¶¶ 3, 5, 9, 15, 16, 19, 21, 23, and 25.

31. For instance, one of the requirements of Rev. Proc. 92–59 limits the amount of attorney's fees that public interest law firms can collect over a five-year period. Calculating this amount requires information covering the four years preceding the taxable year. The total amount of all attorney's fees must not exceed 50 percent of the total cost of operation of the organization's legal functions. This percentage is calculated over a five-year period, including the taxable year in which fees are received and the four preceding taxable years (or any lesser period of existence). Rev. Proc. 92–59 § 4.05.

cial Watch for the years still subject to audit, and thus, petitioner has met its burden of showing that "they may be relevant" to the inquiry. *Powell,* 379 U.S. at 57, 85 S.Ct. 248.

 While most of the information requested in the summons meets the lenient test of relevancy, the Court shares Judicial Watch's concern that the request for all internal and external correspondence (Summons ¶¶ 15, 23) is overly broad insofar as it seeks information that is not relevant to the audit.[32] *See United States v. Ladd,* 471 F.Supp. 1150, 1157–58 (N.D.Tex.1979) (request for "any and all correspondence and any other notes or memorandums pertaining to" the taxpayer is overbroad; it "does not provide sufficient particularity to enable the taxpayers to identify records sought" and "fewer than all records arguably within this language are relevant to the IRS' purpose.") This is not, however, a reason to quash the subpoena. "[I]f a summons appears to be overly broad and therefore unenforceable, the district court may modify the summons and delineate appropriate limitations so that it sufficiently describes the documents sought." *Malnik,* 489 F.2d at 687 n. 4. *See also United States v. Luther,* 481 F.2d at 433 (modifying and narrowing a summons requesting corporate records including minute books and correspondence files to require production only of corporate records reflecting the "receipt or disbursement of money" or relating to "financial or property transactions of the corporation.") Consequently, the Court directs the government to narrow the requests contained in ¶¶ 15 and 23 of the summons so that they are limited to nonprivileged documents that are relevant to the audit and that are described with reasonable particularity to enable the taxpayer to identify the records sought.

## CONCLUSION

This IRS audit was authorized five years ago. It has been delayed for many years, but now the Administration has changed and Commissioner Charles Rossotti is no longer the head of the IRS. The delay cannot be permitted to continue. The summons was issued in good faith and for a legitimate purpose, it does not infringe respondent's rights, and the requests (with the exception of ¶¶ 15 and 23) are not overbroad or irrelevant. It should therefore be enforced consistent with the Order that accompanies this Memorandum Opinion.

## *ORDER*

Accordingly, it is this _____ day of December, 2002, hereby

**ORDERED** that the Petition to Enforce Internal Revenue Summons [1–1] is **GRANTED** with the exception of ¶¶ 15 and 23 of the summons; and it is

**FURTHER ORDERED** that Petitioner shall modify these paragraphs of the summons in accordance with this Memorandum Opinion within ten (10) days of the date of this Order; and it is

**FURTHER ORDERED** that Respondent shall comply with the summons within forty-five (45) days of the date of this Order.

**SO ORDERED.**

---

**32.** Specifically, the summons directs Judicial Watch to provide "all minutes of the Judicial Watch Board of Directors and any other internal committees, and all internal written correspondence for the calendar years 1994, 1995, 1996, 1997, 1998, 1999, and 2000" (Summons ¶ 15) and "any and all outgoing and incoming correspondence files for the calendar years 1994, 1995, 1996, 1997, 1998, 1999 and 2000" (Summons ¶ 23).